**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **UNITED STATES,** | : | |
| *ex rel.* **DONALD PALMER,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **NO. 12-907** |
| **C & D TECHNOLOGIES, INC.,** | : | |
| **Defendant.** | : | |

**MEMORANDUM**

PRATTER, J.                                                                                          JULY 22, 2015

Relator Donald Palmer filed this *qui tam* action alleging that his former employer C&D

Technologies defrauded the Government when it changed its manufacturing procedures for

manufacturing back-up batteries for missiles without informing or seeking approval from the

Government.  Both parties have filed motions for summary judgment.  Both parties have also

moved to exclude at least one of the opposing party's experts.  Because genuine issues of

material fact exist, the Court will deny both motions for summary judgment, and while the Court

cautions both parties to keep their experts from straying into the province of the jury and from

opining on issues not encompassed by their reports, the Court will similarly deny the *Daubert*

motions for the reasons that follow.

FACTUAL AND PROCEDURAL BACKGROUND

C&D manufactures two types of custom ICBM batteries for the United States, the RN-

145 and the RN-148.  C&D began making these batteries in the 1970s and is the United States'

sole supplier.  The batteries consist of a large blue steel cabinet (called a tray) that contains eight

plastic rectangular jars which house battery plates and acid (called battery cells).  The jars are

capped with a hard rubber cover or lid.  In the manufacture of the batteries, both the battery jars

and lids are sandblasted to roughen the surface of the lids and jars.  The lid is then attached to the

jar with epoxy, and the assembly is coated with polyurethane.  There is a dispute of fact as to

whether this sandblasting process is done to improve the polyurethane coating's ability to bond

to the jar and cover or to improve the epoxy's ability to adhere the cover to the jar, and a dispute

as to whether the epoxy seal is to seal the battery to keep electrolytes in the battery or to create a

dam to keep polyurethane out.  In any case, these steps in the manufacturing process are reflected

in C&D's procedure specifications M-551 (for the RN-145 batteries) and M-556 (for the RN-148

batteries).

Until 2006, the sandblasting of both the jars and the covers was performed with #4 grit

flint at 120 to 140 psi, and that is reflected in C&D's procedures.  When C&D's subcontractor

died in 2006, C&D began sandblasting the covers in-house at its Attica, Indiana facility using

aluminum oxide instead of flint.  The jars were still sandblasted with flint by subcontractors until

2013, at which time the subcontractors informed C&D that they were having trouble obtaining

flint.  At that time, C&D instructed them to use #24 grit aluminum oxide instead.

1.  *The Contracts*

In August 2005, C&D submitted a bid to the United States in response to a solicitation

for RN-145 and RN-148 batteries.  The Government accepted C&D's offer and issued a

requirements contract that would run for one year, with the option to renew the contract for four

additional one year periods.  The batteries were identified in the contract by national stock

number, part number, and cage code.  The batteries were also designated as "Critical Application

Items."  The contract provided that:

> This award consummates the contract which consists of the following documents:
> (a) the Government's solicitation and your offer, and (b) this award/contract.  No
> further contractual document is necessary.

2006 Contract, Ex. 2 to Relator's Mot. Summ. J., at 1, Block 18.[1]  The contract also specified

that, "All requests for waivers or deviations classified as critical, major, and minor must be

forwarded to the DSC [Defense Supply Center] Contracting Officer for review and approval."

*Id.* at 3, 6.  Under the contract, the Government could reject an entire order or shipment if a

single defect was found, either upon pre-shipment inspection or after shipment.  The contract

also stated that, "DSCR does not currently have an approved technical data package available for

this NSN.  Please do not submit request to DSCR-VABA," and the box for

"Descriptions/Specs/Work Statement" is not checked.  *Id.* at 1, Block 16.C; 3.  In the 2005

Solicitation Offer, the boxes for "technical data agreement" and "technical data" are not checked

as included as exhibits to the Solicitation Offer.  2005 Solicitation and Offer, Ex. E to Relator's

Mot. Summ. J., at 22.

　　　　When the contract expired in 2011, the United States continued to order batteries from

C&D through a series of follow-on solicitations, contracts, and purchase orders, each of which

contained the same language regarding requests for waivers and rejection of entire shipments

based on a single defect found during an inspection.

　　　　*2.   The Specifications*

　　　　Over the course of the relationship between C&D and the Government, C&D has

provided copies of its internal manufacturing specifications and has often informed the

Government of changes to the specifications.  C&D also has sought Government approval for

deviations from its specifications.  C&D also provided technical drawings of the batteries to the

---

[1] The Relator states that the contract provides "Contractor agrees to furnish and deliver all items or
perform all the services set forth or otherwise identified above and on any continuation sheets for the
consideration stated herein.  The rights and obligations of the parties to this contract shall be subject to
and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such
provisions, representations, certifications, and specifications, as are attached or incorporated by reference
herein," which is the language in Box 17 of the contract, but that box is not checked off, whereas Box 18
(the language quoted above) is checked off.

Government at some point in time, and those drawings refer to the specifications for the RN-145 and RN-148 batteries as "Government Document M-551" and "Gov't Document M-556." According to a C&D employee and to an email from a Government employee, the reference to the specifications as "Government" documents was erroneous.

In 2012, C&D provided updated M-551 and M-556 specifications to the Government. The M-551 procedures included a revision that referred to the use of aluminum oxide as a blast media, but did not delete the reference to flint. The M-556 procedures, perhaps inadvertently, did not include a mention of aluminum oxide. After a paragraph-by-paragraph review, the Government did not take issue with the addition of aluminum oxide to the M-551 procedures, but the aluminum oxide addition also was not mentioned in the "Revision Record" which highlighted the changes to the specifications.

C&D employees have testified at depositions that the M-551 and M-556 specifications were internal specifications only, while a Government inspector, Mr. Robinson, testified that he believed there was a technical data package, including the M-551 and M-556 specifications, associated with the batteries and that C&D was obligated to provide a product complying with those specifications. Mr. Robinson also testified that the Government established a set list of areas/processes that it sent inspectors to examine when deciding whether to accept the batteries, and that list did not include inspection of the sandblasting process.

*3. Battery Defects*

In 2010, the Government sent some batteries back to C&D because they failed voltage leak tests.[2]  C&D performed a root cause analysis, through which it detected a jar-to-cover leak in one cell of the first battery it tested. The final investigation report discussed an adhesive

---

[2] Since 2006, 10 batteries of 966 have been returned for repair due to a failed voltage test.

failure as the likely culprit, and, among other methods of fixing the problem, C&D stated that it would work with the jar vendor to "improve uniformity of jar (and cover) sandblasting, since the mechanical bond is very sensitive to material surface variability."  September 10, 2010 Report to Defense Supply Center re: Returned Leaking RN-148 Batteries, Ex. 33 to Relator's Mot. Summ. J., at 2.  C&D told the Government, and still maintains now, that the voltage leaks would not affect battery performance.  The analysis of the leaks did not mention the blast media used to sandblast the jars or covers.[3]

C&D has suggested a change in procedure to adhere the lid to the jar using a chemical bonding process to completely seal the jars, but the Government has rejected this offer to change the sealing process.

### 4.  *The Relator and his Lawsuit*

Donald Palmer was a product engineer at C&D's headquarters in Blue Bell, Pennsylvania.  In July 2008, he traveled to C&D's Attica, Indiana facility, and while there, he learned that C&D had substituted aluminum oxide for flint as its sandblasting media for the RN-145 and 148 batteries.  He reported the matter to C&D management, warning that, "If it is a contract requirement to use the Flint process, then that is what must be used, unless a written waiver from the government has been obtained prior to starting the contract."  *See* Ex. 63 to Relator's Mot. Summ. J.

Mr. Palmer's employment was terminated in 2011.  In 2012, Mr. Palmer filed this *qui tam* suit, alleging violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)(A) and (B).  After this suit was filed, the Government investigated the claims made in Mr. Palmer's suit.

---

[3] The Relator argues that this shows a continued effort of C&D to conceal the switch to aluminum oxide, while C&D argues that because it was the jars, and not the covers, that were inconsistently sandblasted, the blast media was clearly not the issue (the jars were sandblasted by subcontractors hired by the jar manufacturers using flint until 2013).

After completing the investigation, the Government declined to intervene.  Since the time of the investigation, the Government has ordered more batteries per year from C&D than it has in the past and has waived on-site inspection from time to time.

After the Government declined to intervene and the case was unsealed, Mr. Palmer amended his Complaint to add a retaliation claim, which he later withdrew after C&D filed a counterclaim for breach of contract, alleging that the retaliation claim violated portions of Mr. Palmer's Separation Agreement.  He more recently amended his Complaint to expand his claims to include all batteries delivered subsequent to the original Complaint through the present as violative of the FCA.

Both parties have filed motions for summary judgment.  Both parties have also moved to exclude at least one of the opposing party's experts.  Each of those motions will be discussed below.

## LEGAL STANDARD

### A. *Daubert* Motions

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Supreme Court, in *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993), imposed upon district courts the role of a gatekeeper, charging trial courts to "ensure that any

and all scientific evidence is not only relevant, but reliable." *ID Sec. Sys. Can., Inc. v. Checkpoint Sys., Inc.,* 198 F. Supp. 2d 598, 601–02 (E.D. Pa. 2002) (quoting *Daubert,* 509 U.S. at 589). When "faced with a proffer of expert scientific testimony . . . the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand and determine a fact in issue." *Id.* at 602 (quoting *Daubert,* 509 U.S. at 592). The gatekeeping function of the district court includes not just scientific testimony but also "testimony based on . . . 'technical' and 'other specialized' knowledge." *Id.* (quoting *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141 (1999)).

**B. Motions for Summary Judgment**

The standards by which a court decides a summary judgment motion do not change when the parties file cross-motions. *Se. Pa. Transit Auth. v. Pa. Pub. Util. Comm'n*, 826 F. Supp. 1506, 1512 (E.D. Pa. 1993). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id*.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "'showing' – that is,

pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. Under Rule 56, the Court must view the evidence presented in the motion in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 255.

## DISCUSSION

### A. *Daubert* Motions

C&D seeks to exclude two of Mr. Palmer's experts: Retired Air Force Colonel Gary Poleskey and Dr. David Bahr.  Mr. Palmer moves to exclude one of C&D's experts: Joseph Groeger.  Because the objections to the experts are largely issues that could be addressed on cross-examination rather than reasons to exclude the experts, the Court will deny all of the parties' *Daubert* motions.  *See Daubert,* 509 U.S. at 595 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Stecyk v. Bell Helicopter Textron, Inc.,* 295 F.3d 408, 414 (3d Cir. 2002) ("A party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination.").

#### 1. *Motion to Exclude Relator's Expert Gary Poleskey*

Retired Air Force Colonel Gary Poleskey opines that although the contract between the Government and C&D does not explicitly refer to or incorporate M-551 and M-556, those specifications are part of the contract, and therefore any variances from those procedures result in nonconforming goods and a breach of contract.  He is offered as an expert in Government

contracting.  C&D argues that Col. Poleskey makes unwarranted logical leaps in order to arrive at his conclusion that the Government retained configuration control over the missile batteries (and therefore that the M-551 and M-556 procedures were part of the contract).  For instance, Col. Poleskey opines that because the batteries were given National Stock Numbers ("NSNs"), the batteries are non-commercial items.  He then opines that because the Government does not maintain configuration control of commercial items, the fact that the batteries are non-commercial items means that the Government did maintain configuration control over the batteries.  C&D argues that this is not the logical conclusion to draw, and C&D's expert agrees that because the Government yielded configuration control over commercial items, it does not automatically follow that it maintains it over all non-commercial items, especially without any mention of configuration control in the contract.  C&D also argues that because later purchase orders *do* specify configuration control over certain things but not over other things (like sandblast media), explicit mention is required.

C&D also takes issue with Col. Poleskey's assumption that the Government once explicitly approved the drawings and specifications of the missile batteries, even while he admits that no hard evidence of that exists.  According to C&D, Col. Poleskey accounts for this lack of evidence in the record by assuming that the documentation was lost.  He also interprets the contract language, "DSCR does not currently have an approved technical data package available for this NSN.  Please do not submit request to DSCR-VABA," as meaning *not* that the Government did not maintain a technical data package, but that DSCR simply did not have copies of the technical data package, which C&D argues strains the plain language of the contract.  Finally, C&D argues that to the extent Col. Poleskey interprets the contract and construes C&D's contractual obligations, he is making impermissible legal conclusions.

Relator states that because Government contracting is confusing and arcane, an expert like Col. Poleskey can help the trier of fact by shedding light on the meaning of contract terms in the context of standard Government contracting practices.  Relator cites to Third Circuit case law that permits expert testimony on "business customs and practices," and argues that that is all that Col. Poleskey is doing in his report.  *See U.S. v. Leo*, 941 F.2d 181, 196-97 (3d Cir. 1991) (allowing testimony of Government contracting expert in criminal trial to shed light on what someone in defendant's position would have known about industry custom, as long as expert's testimony dealt only with customs and did not speak to legal requirements); *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195 (3d Cir. 2006) (allowing expert on securities transactions to show defendant's state of mind); *see also Sparton Corp. v. U.S.*, 77 Fed. Cl. 1, 8 (Fed. Cl. 2007) ("In the absence of specialized trade usage, expert testimony regarding proper contract interpretation is inadmissible, as is expert testimony regarding the legal significance of the contract language.").  Relator argues that with all the specialized terms like NSN, CAGE codes, DD Forms, and the like, expert testimony would be helpful to the trier of fact, and that Col. Poleskey has relied on his extensive military contracting experience, as well as the record in this case.

C&D replies that Col. Poleskey relies on model specifications that he erroneously assumed were Government-approved specifications, when those supposedly approved specifications were for an entirely different type of battery or were only preliminary proposals never accepted by C&D.[4]  Moreover, C&D argues that Col. Poleskey is not simply testifying to

---

[4] C&D points to an affidavit by employee Drew Heimer to support this contention.  In another part of the briefing, Mr. Palmer seeks to exclude portions of this affidavit, arguing that Mr. Heimer contradicted at least some of what he said in the affidavit in his deposition, claimed previously that he did not have knowledge of certain facts about which he now speaks, and was not working on the batteries at the time frame about which he speaks in portions of his affidavit.  This, again, is more grist for the cross-examination mill.

Government contracting customs, but rather that he is testifying to the meaning of specific contract terms.

The Court concludes that an expert like Col. Poleskey could be helpful to the trier of fact in wading through the technical terms involved in Government contracting.  This case involves a great deal of technical terminology and a long relationship between a contractor and the Government, and all of the customs and language wrapped up in that very specialized world likely will be outside the common experience of jurors.  In his report and at his deposition, however, Col. Poleskey comes very near interpreting contractual provisions in a way that could invade the province of the jury.  Thus, while the Court will not exclude Col. Poleskey from testifying, the Court admonishes Col. Poleskey to remain in the province of the general business and customs of Government contracting and not to stray into the realm of legal conclusions about contractual obligations.

### 2. *Motion to Exclude Relator's Expert Dr. David Bahr*

Dr. Bahr opines that using aluminum oxide rather than flint to sandblast the battery covers and jars led to defective batteries requiring substantial repairs.  C&D moves to exclude his testimony, arguing that it is speculative, unreliable, and prejudicial.  Dr. Bahr is the head of the materials engineering school at Purdue University, and C&D does not argue that he lacks the appropriate qualifications.

To determine whether the difference in sandblasting media had an effect on adhesion, Dr. Bahr himself sandblasted two covers and jars, one with flint and one with aluminum oxide. C&D argues that he used a different kind of flint than that used to sandblast the jars and covers at C&D, and that the flint he used was expressly prohibited for use in sandblasting operations.  He also did not replicate the conditions and methods used by C&D and its vendors to sandblast the

cover and jar, including the space where the sandblasting was performed (open vs. closed), the reuse or recycling of blast media, the nozzle size, standoff distance, duration, and/or angle. Indeed, he testified at his deposition that he did not even know what conditions or methods were used by C&D.  C&D claims that Dr. Bahr matched his tested material to a picture showing an acceptable level of sandblasting, rather than matching it to a physical sample of sandblasted material.  C&D also argues that his test of the bond strength of the adhesive misses the point of the epoxy use, which was not to make a "seal."  Moreover, C&D argues that Dr. Bahr himself stated that his test was inconclusive and that the impact of the blast media change "cannot be assumed" and "must be analyzed in more detail," in part due to his very small sample size.

Relator argues that Dr. Bahr surveyed published literature on surface roughness and adhesion and performed an experiment that as closely approximated C&D's own 1971 testing of adhesion strength as possible.[5]  He discounts the other differences, noting that the M-551 and M-556 specifications do not include procedures for nozzle size, standoff distance, duration, and/or angle, and that therefore the testing that Dr. Bahr did was arguably consistent with the specifications.  Relator argues that C&D does not explain the significance of Dr. Bahr's use of a different kind of #4 flint than that used in the past by C&D and its vendors, nor does it explain the significance of the other variations.

The differences pointed out by C&D may at first blush seem significant, but as Relator noted, C&D does not then explain the supposed significance of these differences.  The key issue appears to be whether the 1971 adhesion testing was significant in the product design of the batteries or not, and the parties have presented conflicting evidence as to that issue.  C&D says it was not significant, and Relator says that C&D has only adopted that position for this litigation.

---

[5] C&D argued in connection with its opposition to the Relator's summary judgment motion that the 1971 testing was irrelevant.

Because this is a disputed issue, the Court will not exclude Dr. Bahr given that the factfinders could ultimately decide in C&D's favor on this dispute. The flaws that C&D cites are certainly fodder for cross-examination but not reasons to wholly exclude Dr. Bahr from testifying at trial.

> When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in [Rule 702] on "sufficient facts or data" is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

Fed. R. Evid. 702 advisory committee's note. Thus, the Court will deny the motion.

### 3. *Motion to Exclude Defendant's Expert Joseph Groeger*

Joseph Groeger is an engineer who offers opinions on aluminum oxide versus flint as a sandblasting media, ICBM battery leakage and "failure," and Relator's expert, Dr. Bahr. Relator first takes issue with Mr. Groeger's conclusion that a breach in the epoxy seal would not lead to battery failure, even if it led to an electrolyte leak. He points out that while Mr. Groeger states that leaking electrolyte would not form a conductive path, C&D itself referred to leaked acid in batteries returned by the Government as creating a conductive track. Relator also argues that the "wetting" tests performed by Mr. Groeger were unreliable because Mr. Groeger did not follow accepted methodology, did not test the correct part of the missile battery (the abraded jars and covers), and only tested them on a flat surface, rather than in motion to replicate transit or other "realistic" battery conditions. Relator contends that Mr. Groeger's definition of battery failure differs from the Air Force's definition in that Mr. Groeger deems a failure an inability to function properly while the Air Force deems a failure to be any failure to meet a specification.

Next, Relator argues that Mr. Groeger's opinion that flint and aluminum oxide are interchangeable for the purposes of sandblasting is not reliable. He claims that in Mr. Groeger's analysis of the flint used by Dr. Bahr, Mr. Groeger did not follow an accepted methodology or prevent surface contamination and found materials in the sample consistent with contamination.

Relator also argues that Mr. Groeger's comparison of the basic properties of flint (that it cleaves easily and consists of varying particle sizes) and aluminum oxide (that it does not cleave easily and therefore lasts longer and provides a more consistent result) is meaningless because it did not involve any actual testing.  Relator contends that Mr. Groeger's testimony that aluminum oxide is commonly used and readily available does not fit the case because it does not bear on whether aluminum oxide was acceptable for the specific application at hand.

Relator also points to a number of opinions that he contends were only added at the time of the deposition and therefore are inadmissible because they were not disclosed in the report. Specifically, Relator states that Mr. Groeger opined at his deposition that "a properly sandblasted surface with aluminum oxide would perform adequately in this application," that aluminum oxide provides a better and more consistent surface, and that aluminum oxide is a viable substitute for flint.  Relator argues that at his deposition, Mr. Groeger could not identify anywhere in his report where he opined on the effect of changing from flint to aluminum oxide for the sandblasting relating to jar-to-cover seal.

Finally, Relator challenges Mr. Groeger's criticism of Dr. Bahr's testing.  He argues that Mr. Groeger did no testing of his own to challenge Dr. Bahr's results and that Mr. Groeger did not explain the significance of any of the differences between Dr. Bahr's tests and C&D procedures.

C&D opposes Relator's motion.  Much of the argument is centered on the purpose of the use of epoxy between the jar and the cover – whether it is used as an adhesive seal or simply as filler to keep polyurethane from entering the battery cell.  C&D also argues that Mr. Groeger's methodology in performing his wetting test was sound and that his definition of battery failure (*i.e.*, failure means that a missile battery does not perform and provide its rated output, rather

than failure means that a battery leaks some acid) is relevant because of the Relator's contention that an acid leak would lead to system failure.  C&D does not directly address the contention that some of Mr. Groeger's opinions offered at his deposition were not included in his report.

Aside from the issue of whether some opinions were only offered at the deposition, again the disagreements are perfect grounds for cross-examination.  Therefore, the Court will deny Mr. Palmer's motion to exclude Mr. Groeger, without prejudice to Mr. Palmer objecting at trial to any opinions that stray from the material contained in Mr. Groeger's expert report.

### B.  Cross Motions for Summary Judgment

The Relator alleges that C&D violated two provisions of the FCA, 31 U.S.C. § 3729(a)(1)(A) and (B).  Among other restrictions, § 3729(a)(1) makes any person liable who "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;" and/or "(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(A), (B).

A relator must prove a false "claim" violation under Section 3729(a)(1)(A) by proving that: "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." *Hutchins v. Wilentz, Goldman & Spitzer,* 253 F.3d 176, 182 (3d Cir. 2001).  To establish a § 3729(a)(1)(B) violation, known as a false statement violation, a relator must also prove "that the defendant made or used (or caused someone else to make or use) a false record in order to cause the false claim to be actually paid or approved" and that the false statement was material.  *U.S. ex rel. Schmidt v. Zimmer, Inc.,* 386 F.3d 235, 242 (3d Cir. 2004).

Relator contends that C&D violated 31 U.S.C. §§ 3729(a)(1)(A) by promising the Government that it would deliver batteries that complied with the M-551 and M-556

specifications but instead provided batteries that did not conform to those production standards.[6] He also claims that C&D violated 31 U.S.C. § 3729(a)(1)(B) by submitting master drawings that stated that the batteries would be made in accordance with M-551 and M-556, stating in those procedures that flint would be used as a blast medium, not disclosing that a failure to use flint caused the leaks in the jar-cover seals found in 2010, and otherwise failing to disclose that the batteries that it was delivering to the Government were sandblasted with aluminum oxide.

C&D counters that there was no contractual obligation to comply with its own internal production specifications, that, if there was such an obligation, the contract was ambiguous enough that it was reasonable for C&D to believe that there was no such obligation, that C&D never had to certify compliance with specifications to the Government either expressly or impliedly to obtain payment, and that the change in blast media was not a material one. There is no dispute that C&D submitted claims to the Government, so the Court will move to the next element of the tests under the FCA and look at whether any or all of those claims were false.

### 1. Falsity

There are two types of falsity for purposes of the False Claims Act: factual falsity and legal falsity. *See U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3d Cir. 2011). A claim is factually false when a contractor misrepresents what goods it has provided to the Government, and cases involving factually false claims are also referred to as product substitution cases. A claim is legally false if a contractor falsely certifies that it complied with a statute or regulation and that compliance is a condition of payment. *Id.*

The Relator states that his case against C&D is one for product substitution (*i.e.*, factual falsity). He claims that C&D was required to comply with all of the specifications set forth in its

---

[6] Although Relator does not seek summary judgment on this aspect of his claim, he also claims that the batteries made using different sandblasting media were of lower quality and were nonconforming for that reason, as well.

internal M-551 and M-556 procedures and that it changed the sandblast media set forth in these specifications without seeking approval.  He argues that, at least for purposes of his motion for summary judgment, it is irrelevant whether the batteries sandblasted with aluminum oxide were just as good as those sandblasted with flint (while not conceding that they were), and he cites several cases in which goods were mislabeled or substituted.[7]  In support of his contract interpretation, he offers the report of his expert, Col. Poleskey, who opines that the assignment of a National Stock Number ("NSN") signifies that the Government is ordering a very specific part manufactured in a very specific way (*i.e.,* the assignment of an NSN incorporates the manufacturing specifications) and that the language in the contract about all deviations needing to be approved by the Government referred to manufacturing specifications as well as all of the terms explicitly set out in the contract.  He also relies on the testimony of Mr. Robinson, a Government inspector who stated that he believed that batteries that were not made pursuant to the precise specifications set forth in the M-551/M-556 procedures were nonconforming and would not have been accepted.  Mr. Palmer argues that C&D shared master drawings with the Government that said the batteries would be manufactured in accordance with M-551 and M-556, although he does not contend that those drawings were *explicitly* incorporated into the 2005 contract.  Finally, Mr. Palmer claims that the long history of C&D submitting for approval changes in the specifications to the Government, even when those changes were relatively minor,

---

[7] In some of the cited cases, the liability of the defendant was not at issue, so those cases do not give much guidance on determining falsity. *See, e.g., U.S. v. Bornstein*, 504 F.2d 368 (3d Cir. 1974); *U.S. v. Aerodex, Inc.*, 469 F.2d 1003 (5th Cir. 1972).  In the other cited cases, the contract was clear and unambiguous in its requirements. *See U.S. ex rel. Compton v. Midwest Specialties*, 142 F.3d 296 (6th Cir. 1998) (holding that contract unambiguously required certain testing of brake pads and that failure to test in compliance with contract requirements rendered claims false); *U.S. v. Nat'l Wholesalers*, 236 F.2d 944 (9th Cir. 1956) (contract required regulators with specific proprietary numbers, so providing regulators that were "equals" was not good enough to satisfy contract).

shows that the contract required that C&D abide by the specifications unless the Government approved a specific deviation therefrom.

C&D counters that the language of the contract is what it is and is not ambiguous.  It is true that the contract does not state explicitly that the batteries had to be manufactured in accordance with any particular procedures, even though that could have been specified and the production specifications could have been incorporated by reference.  Indeed, there are boxes to check to indicate that specifications are included, and those boxes are not checked on this contract.  C&D explains that the deviation language referred to the many procedures explicitly set forth in the contract for packaging, labeling, and delivery, not to the product specifications.  And it argues that the fact that configuration control over some aspects of production was explicitly specified in later contracts implies that configuration control only exists when it is explicit and that the Government knew perfectly well how to make it clear that it exercised configuration control when it so desired.  Even though Mr. Palmer does not argue in his motion that the quality of the batteries matters, C&D argues that the change in sandblast media had no impact on quality.

The Court finds that the contract in question here is ambiguous on the point at issue.  The parties have presented conflicting evidence regarding how specific the product the United States contracted to purchase was intended to be.  On the one hand, the contract does not incorporate C&D's production specifications *explicitly* or specify configuration control.  On the other hand, the United States clearly did not intend to buy just *any* batteries.  Even C&D acknowledges this, when it argues that the only changes to the batteries for which it needed approval were changes to the fit, form, or function of the batteries, even though the contract does not say anything about fit, form, or function.  Add to all of this the deviation clause, which is less than clear in its

application, and the course of dealing between the parties, which involved C&D seeking permission for deviations from specifications for even seemingly minor deviations at times and therefore suggests that C&D may have interpreted the deviation clause as applying to *all* deviations, and the question of precisely what the United States contracted to buy is an open one.

For these reasons, the falsity of the claims submitted to the United States is a contested issue, making summary judgment inappropriate for either party on this issue.

2. *Scienter*

Even though the Court has already held that the falsity of the claims is an open issue, the issues of scienter and materiality still must be analyzed, as C&D could be entitled to summary judgment on one or both claims if it is able to show that, although false, the claims were not submitted knowingly or that any false statements were immaterial. Therefore, the Court will move on to the scienter element. In FCA cases, the relator must show that the defendant acted knowingly. 31 U.S.C. § 3729(a)(1)(A), (B). The statute defines "knowing" and "knowingly" as follows: "a person, with respect to information-(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information," and no proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1). Congress clearly did not intend to "'punish honest mistakes or incorrect claims submitted through mere negligence.'" *U.S. ex rel. Hochman v. Nackman,* 145 F.3d 1069, 1073 (9th Cir. 1998) (quoting S. Rep. No. 99–345, at 7 (1986), *as reprinted in* 1986 U.S.C.C.A.N., 5266, 5272). In other words, a relator may not "shoehorn what is, in essence, a breach of contract action into a claim that is cognizable under the False Claims Act." *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.,* 525 F.3d 370, 373 (4th Cir. 2008).

The Relator argues that since C&D knew that its internal specifications required the use of flint and knew it promised to comply with those regulations, it knew that batteries sandblasted with aluminum oxide were nonconforming products.  Because the Court has already held that the contract was ambiguous, it therefore cannot be said conclusively that C&D knew that it promised to comply with its internal specifications.  Mr. Palmer points to his own email to others at C&D saying that if flint was required by the Government contract, C&D needed to use flint, thus putting C&D on notice of the possible non-conformance of its products at least as of that date. As to that evidence, at best it indicates knowledge at the time Mr. Palmer sent that email but not necessarily before the email was sent.  At worst, because Mr. Palmer's email was couched in less than definite terms ("*If* it is a contract requirement to use the Flint process . . .") (emphasis added), it is possible that the readers of that email simply determined that the contract did *not* require the use of the flint process and took no further action because of that determination.

Mr. Palmer also argues that if C&D thought the contract was ambiguous, it should have discussed that ambiguity with the Government.  For this point, Mr. Palmer cites a few cases that are distinguishable.  For instance, in *Newsom v. U.S.*, 676 F.2d 647 (Ct. Cl. 1982), the court found that the Government's solicitation included a patent (*i.e.*, glaring) ambiguity about what should be included in a bid, and that the contractor therefore had a duty to clear up that ambiguity.  The case was very specific to the bidding context, and involved a glaringly obvious ambiguity.  The *Newsom* court noted that if the ambiguity was not patent, then the court may look at whether the party's interpretation was reasonable.  Mr. Palmer also relies on *U.S. v. Bourseau*, 531 F.3d 1159 (9th Cir. 2008), but the court in that case found that the defendant did not rely on a reasonable interpretation of the contract or regulations in good faith, but rather

deviated so far from what was required that there could be no doubt he acted knowingly.  The situation here is far more nuanced than the situations involved in those cases.

Finally, the Relator argues that because C&D told the Government about other "minor" deviations in procedure over the years and sought the Government's approval of those deviations, C&D knew that it needed to do so with respect to the change in blast media to remain in compliance with the contract.  C&D, on the other hand, characterizes its past dealings with the Government not as evidence of a contractual obligation but of an open and cooperative relationship.  Both parties cite to the course of dealing between C&D and the Government as evidence either for or against a finding of scienter.  Indeed, the course of dealing between C&D and the Government, during which C&D asked permission for even minor deviations, can be interpreted as suggesting *either* that C&D did not genuinely believe that the specifications were separate from the contract or that C&D occasionally acted in an overly cautious and solicitous manner in dealing with the Government.

C&D also argues that the Government knew that C&D was using aluminum oxide.  One C&D employee averred that he talked to a Government inspector about the use of the aluminum oxide; the Government inspector, however, did not recall the conversation, and there is no written record of this exchange of information.  To the extent that a C&D employee actually did tell a Government representative about the switch in sandblasting media, then under the circumstances here that exchange of information, at best, could serve to limit the number of invoices representing false claims, as invoices for batteries ordered *after* that conversation (the timing of which is not specified) may not be false claims under the statute.  *See, e.g., U.S. ex. rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 289 (4th Cir. 2002) (collecting cases from various courts of appeals and holding that "*prior* government knowledge of an allegedly

false claim can negate the scienter required for an FCA violation") (emphasis added).  That does nothing to negate the scienter requirement *before* that information was conveyed but after the change in sandblasting media.  The same C&D employee averred that the aluminum oxide was kept out in the open at the plant such that any Government inspector touring the facility could have seen it.  Evidence of the openness of the factory, including the sandblasting area, may well weigh in favor of a finding that C&D did not have the requisite knowledge of wrongdoing, but the Court's task at this juncture is to determine what has been proven (or not) as a matter of law, not to weigh conflicting evidence.

Because the question of whether C&D knowingly submitted false claims is an open one, the Court cannot grant summary judgment to either party on that ground.

 *3.*  *Materiality*

With respect to false statements associated with false claims (the second count under the FCA), those false statements must be material to be actionable.  "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).  C&D argues that even if it did falsely state that the batteries were sandblasted with flint (which it denies), those statements were not material, as evidenced by the Government's continued purchase of the batteries.  The Relator argues that this continued purchasing does not matter, and that what matters is whether the falsity could be *capable* of influencing the decision-making of the Government, not whether the Government, at the end of the day, continued buying the product.  *See U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908 (4th Cir. 2003) (holding that materiality is not negated simply by the Government's decision to continue funding a contract after finding out about false statements).  Once again, this issue turns on the interpretation of the contract.  If the contract

included the specifications, then it would be hard to say that this change was not material, given the deviation clause, even if the Government did still continue to purchase the batteries after learning of the change in sandblast media – a contract with a deviation clause requiring approval of even minor changes suggests that even minor changes could be capable of influencing the Government's decision-making.  If the contract did not include the specifications, then the evidence of the Government's continued purchase is much more probative, but still not dispositive of the issue.  Once more, summary judgment for either party on this issue is inappropriate.

CONCLUSION

For the foregoing reasons, the Court will deny all of the motions discussed above.  An appropriate Order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE